**Joseph P. GEARHART, Plaintiff,**
v.
**UNITED STATES of America, Defendant.**
Civ. A. No. 5594.

United States District Court
E. D. Virginia,
Norfolk Division.
June 9, 1967.

Willcox, Savage, Lawrence, Dickson & Spindle, Richard B. Spindle, III, Norfolk, Va., for plaintiff.

Claude Vernon Spratley, Jr., U. S. Atty., Norfolk, Va., James A. Oast, Jr., Asst. U. S. Atty., Tax Division, Dept. of Justice, Jerry A. Wells, Washington, D. C., for defendant.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

This suit was instituted under 28 U.S.C. § 1346(a) (1) for the recovery of an excise tax which was allegedly collected erroneously from plaintiff. Although the amount in controversy in this case is only $231.30, plus interest, there are a number of similarly situated taxpayers whose rights will be determined by the outcome of this test case. The essential facts, most of which were stipulated, are set forth herein:

Plaintiff is and has been a voting member of Tidewater Horse and Pony Association (hereinafter referred to as "THPA"), a non-stock, non-profit corporation organized under the laws of Virginia in the middle 1950's. He served as a member of the Board of Directors of THPA in 1957 and was chairman of the Stable Committee from 1956 through May 1960.

According to its certificate of incorporation, THPA was organized for the following purposes:

"To operate a nonprofit, nonstock corporation for the promotion of interest in horseback riding and horse and pony shows, which corporation shall have the power to own, operate and/or lease clubs, club facilities, houses, barns, stables, farms, land, riding facilities, horse show facilities, and all types of accommodations and amusement facilities for the benefit of the members of the Tidewater Horse and Pony Association, Incorporated, and their guests and invitees, and to do and perform all acts necessary or incidental to such purposes, including among other things the right to give, conduct, foster or promote riding and horse shows, contests or exhibitions and activities related or incidental thereto."

Shortly after its organization, THPA leased certain properties from Greenbrier Farms, Inc., located in what is now the City of Chesapeake, for the sum of $50.00 per month. On the property there was situated a large cattle barn. The plaintiff, and other persons who desired to stable horses in such barn, constructed at each individual's own expense stalls appropriate for the stabling of horses.

Although the persons stabling horses in said barn were not initially all members of THPA, the great majority were, and it became the practice that all persons stabling horses in the barn should or must become members of THPA. Mr. Withers Floyd, who succeeded plaintiff as chairman of the Stable Committee, testified that some persons stabled their horses on the premises for about 60 or 90 days before joining THPA, but that ultimately they all became members.

There were, of course, many other members of THPA who did not stable any horses in the barn.

Those persons stabling horses in the barn determined amongst themselves, in informal meetings from time to time, an amount to be charged per month to meet expenses. This charge covered the cost of feed for the horses, wages of stable personnel, and, beginning in 1959, the sum of $1 per stall per month which was paid to THPA as a rental fee.[1] During the quarters ending September 30, 1961 through March 31, 1963, this monthly charge was $32.50; beginning with the quarter ending June 30, 1963, the charge was increased to $34.00 per month. Checks were made payable to the THPA Stable Fund or to the chairman of the Stable Committee. These funds were kept in a bank account under the name "THPA Stable Fund", which account was entirely separate from the main THPA account. All disbursements for feed and wages of stable personnel and for the stall rental were made from the THPA Stable Fund, as were withholding and social security payments for stable personnel.

Those persons stabling horses elected a chairman of their group, who at all times pertinent hereto was the same individual who was chairman of the THPA Stable Committee. This person had sole authority to draw on the THPA Stable Fund, and he prepared monthly reports of the aforementioned receipts and disbursements. These reports were entitled "Tidewater Horse and Pony Association —Stable Committee Report" and were prepared under the signature of the Stable Committee, THPA. Although Mr. Floyd testified that it was his practice to post copies of this monthly report in the THPA clubhouse (which was built on the property leased from Greenbrier after THPA's organization), as well as in the stable, both he and plaintiff testified

that THPA did not require the submission of these reports to the Association itself, nor did THPA ever tell the stable group how much it should charge for stable expenses. This matter was determined by the "stable group" at its own meetings, which were held separate and apart from the THPA meetings, but generally following the THPA meetings. There was also evidence that the stable group had its own social security number, but its tax returns were filed in the name of THPA.

In February 1965 the Internal Revenue Service made a deficiency assessment of excise taxes against plaintiff for the period July 1, 1961, through June 30, 1964. Plaintiff paid the assessment, with interest, and filed a claim for refund, which was disallowed. Plaintiff then instituted this action on June 2, 1966.

The excise taxes in question were assessed pursuant to Section 4241 of the 1954 Internal Revenue Code, 26 U.S.C. § 4241,[2] which states as follows:

"§ 4241—*Imposition of tax.*

(a) *Rate.*—There is hereby imposed—

(1) *Dues or membership fees.*—A tax equivalent to 20 percent of any amount paid as dues or membership fees to any social, athletic, or sporting club or organization, if the dues or fees of an active resident annual member are in excess of $10 per year."

The legal issues may be framed thus:

(1) Did the monthly charge to the members of the stable group for the care and feeding of their horses constitute "dues" within the meaning of the statute?

(2) Was THPA, or, alternatively, the "stable group", a "social, athletic or sporting club or organization?"

■ With regard to the first issue, we believe that the monthly assessment

---

1. An excise tax of $ .20 was paid on the $1 rental charge, and this is not in dispute. It is the tax assessment on the remainder of the monthly charge to which plaintiff objects.

2. Section 4241 has now been repealed by § 301 of the Excise Tax Reduction Act of 1965, P.L. 89–44, 79 Stat. 145, but was in effect at all times pertinent hereto.

constituted "dues" as that term has been defined and interpreted. Section 4242 (a) of the Internal Revenue Code of 1954 defines "dues" as follows:

"As used in this part the term 'dues' includes any assessment, irrespective of the purpose for which made, and any charges for social privileges or facilities, or for golf, tennis, polo, swimming, or other athletic or sporting privileges or facilities, for any period of more than six days;"

Additionally, § 49.4242–1 of the Federal Tax Regulations offers this interpretation, in subsection (a) (2):

"In determining whether a charge by such a club or organization constitutes dues or membership fees * * * the test is whether payment of the charge confers the right to use a social, athletic, or sporting privilege or facility of the club or organization for the prescribed period. It is immaterial whether the privilege or facility is one for which a charge is mandatory, even though the member chooses not to avail himself of the privilege or facility, or. whether the privilege or facility is one for which a charge is made only if the member, at his own election, chooses to have the privilege or facility made available to him. Any privilege or facility offered by a social, athletic, or sporting club or organization which is so directly related to a social, athletic, or sporting activity in which the club is engaged, or for which it was created, as to partake of the nature of the activity itself is considered to be a social, athletic, or sporting privilege or facility. This is true even though such privilege or facility, if considered entirely apart from any social, athletic, or sporting activity, would not in and of itself constitute a social, athletic, or sporting privilege or facility."

The Tax Regulations also offer a number of examples of what constitute "dues or membership fees" so as to be subject to tax. Among those items which are regarded as being dues or fees are the following: (1) a "minimum expenditure" of $200 annually charged by a social club for food and drink, with the member being billed for the difference if his actual expenditures are less than that amount; (2) assessments made by a social club to meet expenses, in lieu of regular dues or membership fees; (3) a charge (in addition to regular dues) made by a social club for golf privileges, so long as the privilege is for more than a 6-day period; (4) a charge made by a social club for boat docking and mooring facilities for its members; (5) a charge made by a beach club for the rental of cabins or cabanas to its members, if the period exceeds 6 days. Among the examples of charges which are not considered to be taxable dues or membership fees are the following: (1) a social club offers golfing, swimming and skating facilities and also maintains suites of rooms in its clubhouse for occupancy by members and their guests at specified rates. Since these suites bear no direct relation to any club activity, charges for their use do not constitute dues or membership fees, even if the charge is for more than 6 days' use; (2) charges made by a professional golfer attached to a social club for cleaning and storing the golf equipment of members, where such service is undertaken independently by the pro rather than by the club itself; (3) a fine for violation of the rules of an athletic club.

■ From the above definitions and examples, it is obvious that the term "dues or membership fees" has been given a very expansive interpretation by Congress and the taxing authorities. Similarly, the courts have interpreted the term liberally, in consonance with the evident legislative intent. In White v. Winchester Country Club, 315 U.S. 32, 62 S.Ct. 425, 86 L.Ed. 619 (1942) the Supreme Court, reversing the rule which had been established by a number of lower court decisions, held that a charge made by a social club for golf and certain other privileges constituted taxable "dues or membership fees". See also Cohan v. United States, 198 F.Supp. 591 (E.D. Mich. 1961) (annual charge to yacht

club member for a locker, and seasonal charge for a boatwell, held to be taxable dues); Knoll Golf Club v. United States, 179 F.Supp. 377 (D.N.J.1959) (fee for golf locker held taxable); Annot., 100 A.L.R.2d 739 (1965).

■ In a case closely in point, Boots & Saddles, Inc. v. United States, 269 F.Supp. 274, (E.D.Mich. 1966) (otherwise unreported), a federal district court held that a charge of $40 per month by a riding club for boarding its members' horses constituted taxable "dues" under Section 4241.[3] See also Rev.Rul. 60–108, 1960–1 Cum.Bull. 516, holding that charges made by a hunt club to its members for the hire of horses, rental of stalls, and boarding of horses for its members constitute "dues" within the meaning of Section 4242(a), supra, if such charges are for a period in excess of 6 days. While this revenue ruling is not binding upon the court, it is nevertheless persuasive.

Plaintiff relies primarily upon the case of Gould v. United States, 187 F.Supp. 337 (D.Col.1960), aff'd per curiam, 296 F.2d 740 (10th Cir., 1961), which held that amounts paid to a nonprofit riding club by members and their guests for participation in an annual "Big Ride" did not constitute taxable dues. However, that situation is clearly distinguishable from the case at bar. As the District Court pointed out (187 F.Supp. at 344):

"[P]ayments by the plaintiffs to the club are not determined on an annual or other regular periodic basis. They

are of an isolated nature, depending upon participation in club functions and the expenses incurred therein."

By way of contrast, the present case involves a regular monthly charge to all THPA members who boarded horses in the barn. It was not just a "one-shot" assessment as in Gould, but a "payment for the right to repeated and general use of a common club facility for an appreciable period of time." White v. Winchester Country Club, supra. Although the actual expense of caring for the horses undoubtedly fluctuated from month to month, the monthly assessment remained constant with the exception of an increase from $32.50 to $34.00 beginning in April, 1963.

Plaintiff argues that, aside from the $1 per month for rental of the stalls, the monthly assessment was purely for the care and feeding of the horses. He urges that this was merely a personal expense, similar to that of a group of yacht club members who "chip in" to outfit a boat which they have purchased, rather than being payment for a "facility" or "privilege". While conceding that payment for the use of the stalls should be taxed, he contends that the cost of feeding the horses should not be.

We cannot agree. Plaintiff's argument overlooks the fact that the stabling scheme was a group effort conducted over an appreciable period of time under the auspices of THPA and using the club's facilities. It was directly related to the primary purpose of THPA, namely horse-

3. Plaintiff points out certain minor distinctions between *Boots & Saddles, Inc.* and the present case, but they are not materially significant. For example, plaintiff states that all members of Boots & Saddles were required to own a horse and board it in the club's stable, whereas only certain members of THPA owned horses and there was no requirement that they be kept on the premises. However, in the average country club only a portion of the members usually elect to have golf privileges, and yet such a fee is clearly taxable.

Plaintiff also argues that in the case at bar there was no requirement that per-

sons boarding horses in the THPA barn pay the monthly charge (aside from the $1 rental fee), and that each horseowner could have paid his own expenses if he wished. While this may have been true, there is no evidence that any boarders chose to do so. Moreover, we cannot agree with plaintiff's assertion that the monthly assessments were not "fixed". It was stipulated that the monthly charge per horse was $32.50 prior to April, 1963, and $34.00 thereafter. Copies of the monthly stable committee reports which were offered into evidence bear this out.

back riding. It is distinguished from the equipping of a boat or the purchase of a meal at the country club by the fact that this was a continuous and regular course of group conduct.

█ Moreover, even were we to agree with plaintiff that that portion of the monthly charge which was applied to feeding the horses should not be taxed, we do not think the monthly assessment could feasibly be apportioned according to taxable and non-taxable use. To do so would render the tax statute impractical and unworkable. See Knoll Golf Club v. United States, supra; Boots & Saddles, Inc. v. United States, supra. The purpose of the assessment should be viewed as a whole, and so viewing it we think it clearly was compensation for a sporting "facility" or "privilege" and, therefore, constituted taxable dues.

█ Turning to the second issue, we have little difficulty in determining that THPA was a "social, athletic, or sporting club or organization" within the meaning of Section 4241. Plaintiff appears to concede this, but he argues that the so-called "stable group" was entirely separate and independent from THPA, and that, therefore, the monthly payments were not made to a social, athletic or sporting club or organization. Plaintiff points to the fact that the stable group's funds were kept in a separate bank account and were never commingled with those of THPA; that none of the stable group funds were ever paid to THPA, aside from the $1 per stall monthly rental fee; that THPA never exercised any authority or control over the stable group; that the stable group appointed its own chairman, conducted its own business meetings, and determined for itself how much the monthly assessments should be.

Nevertheless, we are of the opinion that the "stable group" was a part of THPA and that the monthly assessments were in effect paid to THPA. The fact that the stable group maintained its own bank account is not persuasive to the contrary; undoubtedly there are many social clubs which maintain separate accounts for separate activities, such as golf, yachting, etc. The barn which the stable group used was leased by THPA from Greenbrier Farms. Moreover, plaintiff conceded that everyone using the barn was either a member of THPA or became a member within a short time after he began using the facilities; otherwise he could not continue boarding his horse there. Although the stable group elected its own chairman, he was one and the same person as the chairman of the THPA "Stabling Committee" which was created by THPA's by-laws. The monthly financial reports of the stable group bore the heading "Tidewater Horse & Pony Association—Stable Committee Report", and Floyd testified that he customarily posted a copy of this report in the THPA clubhouse, even though he was not required to do so. There was also evidence that the stable group normally held its meetings immediately after the THPA meetings. From these facts we think the conclusion is inescapable that the so-called "stable group" was an integral part of THPA, even though the group was given free reign by THPA's officers to manage its own affairs. The fact that THPA was loosely organized and that the by-laws were not followed strictly in regulating the operation of the Stabling Committee does not affect THPA's status as a club or organization, nor the taxability of its dues. As the Ninth Circuit noted in United States v. Howe, 349 F.2d 483, 489 (1965):

> "[L]ack of managerial control and failure to adhere strictly to the club bylaws do not affect the significant fact that members joined for the common purpose of using the facilities of the club or organization."

In view of our finding that the stable group was a part of THPA, we deem it unnecessary to consider the government's alternative contention that the stable group itself constituted a "social, athletic, or sporting club or organization."

Defendant will present an order of dismissal with costs.